**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Tupperware Brand Corporation, *et al.*<br><br><br>Debtor. | Chapter 11<br><br><br><br>Case No. 24-12156 (BLS) |
| Party Products, LLC,<br><br><br>Plaintiff,<br>v.<br><br>Spirit Realty, L.P.,<br><br><br>Defendant. | Adv. Pro. No. 25-50062 (BLS)<br><br>Re: Adv. D.I. 18, 19, 22, & 28 |

## OPINION

Party Products LLC (the "Plaintiff" or "Party Products") filed an adversary complaint against Spirit Realty, L.P. ("Spirit" or the "Landlord") seeking declaratory and injunctive relief regarding Spirit's draw upon a letter of credit provided for in its real property lease with Tupperware Brand Corporation ("Tupperware"), and requesting related relief.[1] The Landlord has filed a motion to dismiss the Complaint. For the reasons discussed below, the Court will deny the Landlord's Motion to Dismiss.

---

[1] Hereinafter, all references to the "Complaint" mean the Amended Complaint filed in this adversary proceeding at Adv. D.I. 11.

1

## BACKGROUND

This adversary proceeding stems from the voluntary Chapter 11 petitions filed by Tupperware and certain of its affiliates (collectively, the "Debtors") on September 17, 2024.[2] Shortly after the petition date, the Debtors filed a motion to sell substantially all of their assets.[3] After an abbreviated marketing process, Party Products was the winning bidder via a credit bid. The record reflects that Party Products is an entity created by holders of the Debtors' prepetition secured debt. By order dated November 24, 2024, the Court approved the sale to Party Products.[4] Under the Asset Purchase Agreement, Party Products acquired certain of Tupperware's assets and assumed certain of Tupperware's liabilities.[5] Importantly for purposes of this dispute, Party Products assumed Tupperware's obligation to reimburse Wells Fargo in the event that Spirit drew upon a $10 million letter of credit that had been posted years earlier by Tupperware to secure its performance under a commercial real property lease.[6] Ultimately, as discussed more fully below, Spirit drew down the full amount of the letter of credit, and the Debtors rejected the lease as of March 31, 2025.[7]

### Tupperware's Lease Agreement and the Adversary Proceeding

The Complaint alleges that in October 2020, Tupperware entered into an eleven-year lease agreement (the "Lease") with Spirit's predecessor for commercial property in Orlando to use as its headquarters.[8] Under the Lease, Tupperware was required to provide a $10,000,000

---

[2] References to "D.I." refer to the main proceeding's docket (24-12156), and references to "Adv. D.I." refer to this proceeding's docket.
[3] D.I. 15.
[4] D.I. 383.
[5] Adv. D.I. 11 ¶ 17.
[6] *Id.*
[7] *Id.* ¶ 19.
[8] *Id.* ¶ 9; *see also* Adv. D.I. 19.

standby letter of credit (the "Letter of Credit") "as security for the full and faithful performance by [Tupperware.]"[9] The Lease also contains a $10,000,000 liquidated damages provision, available upon a Material Default and to be paid first from proceeds of the Letter of Credit.[10] The Lease defines Material Default to include three consecutive months of the tenant's non-payment of rent.[11] The Complaint alleges that the Lease was assigned to Landlord in 2021, and on August 19, 2022, Wells Fargo became the issuer of the Letter of Credit.[12]

The record reflects that on October 2, 2024, shortly after Tupperware's Chapter 11 case was commenced, the Landlord sent a notice of default to Tupperware based upon non-payment of September 2024 rent.[13] On October 22, 2024, Landlord drew on the Letter of Credit in an amount equal to one month's rent.[14] After Tupperware failed to make rent payments for the three months immediately following September, the Landlord declared that a Material Default under the Lease had occurred, and it submitted a draw request to Wells Fargo on January 23, 2025, for $9,589,108.27, which amount represented the entire remaining balance under the Letter of Credit.[15] The Plaintiff promptly commenced this adversary proceeding to prevent the draw, arguing that the amount available to the Landlord under the Letter of Credit is limited by the statutory cap under 11 U.S.C. § 502(b)(6), and that the amount of the proposed draw would exceed the cap.[16]

Seeking to enjoin the draw on the Letter of Credit, Party Products filed a motion for a temporary restraining order.[17] On June 18, 2025, the Court heard arguments and ultimately

---

[9] Adv. D.I. 11 ¶ 9 (quoting Lease § 17.01).
[10] *Id.* ¶ 11.
[11] *Id.* ¶ 39.
[12] *Id.* ¶¶ 12-13.
[13] *Id.* ¶ 15.
[14] Adv. D.I. 19.
[15] *Id.*
[16] Adv. D.I. 11 ¶ 1.
[17] Adv. D.I. 14.

3

denied the request for a temporary restraining order.[18] The Court determined that Party Products had not carried its burden to demonstrate that it would suffer irreparable harm absent the requested relief because the harm alleged was purely economic.[19] Following the Court's ruling, Landlord demanded and received from Wells Fargo the full amount remaining under the Letter of Credit.

Landlord never filed a proof of claim in Tupperware's Chapter 11 case. On May 5, 2025, Party Products filed a proof of claim on the Landlord's behalf pursuant to Bankruptcy Code § 501(b) (the "Proof of Claim").[20]

Oral argument in this matter was held on October 7, 2025.[21] This matter is ripe for disposition.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, as well as the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. Venue is proper in this Court pursuant to 28 U.S.C. § 1408. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) and (O).

## STANDARD OF REVIEW

Spirit has moved to dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to the adversary proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure. When evaluating a challenge to subject matter jurisdiction for purposes of Rule 12(b)(1), "the court may consider and weigh evidence outside

---

[18] *See* Adv. D.I. 29.
[19] *Id.* at 64-65.
[20] Adv. D.I. 11 ¶ 24.
[21] Adv. D.I. 30.

4

the pleadings to determine if it has jurisdiction."[22] The Court will dismiss a claim under Rule 12(b)(1) "only if it clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or is wholly insubstantial and frivolous."[23]

The standard for surviving a Rule 12(b)(6) motion is different from that for a Rule 12(b)(1) motion.[24] For motions to dismiss under Rule 12(b)(6), the Court will "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[25] In *Bell Atlantic Corp. v. Twombly*, the Supreme Court instructed that a pleading must nudge claims "across the line from conceivable to plausible."[26] "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[27] However, the Court need not and should not accept legal conclusions proffered as factual allegations.[28] Likewise, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient.[29]

To determine whether a claim meets the *Twombly/Iqbal* standard of pleading, a Court must draw on its judicial experience and common sense.[30] The Third Circuit follows a three-step process to determine the sufficiency of a complaint:

---

[22] *Gould Electronics Inc. v. U.S.*, 220 F.3d 169, 178 (3d Cir. 2000).

[23] *Id.* (internal quotations omitted).

[24] *Id.*

[25] *Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*, 879 F.3d 79, 83 n.6 (3d Cir. 2018).

[26] *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[27] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[28] *See Twombly*, 550 U.S. at 555; *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) ("we disregard legal conclusions and 'recitals of the elements of a cause of action, supported by mere conclusory statements.'").

[29] *Giuliano v. Haskett (In re MCG Ltd. P'ship)*, 545 B.R. 74, 82 (Bankr. D. Del 2016). Conclusory allegations and bare legal conclusions receive no presumption of truth under *Iqbal* and *Twombly* and are "affirmatively disregard[ed]" by the district courts when passing on a motion to dismiss. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016); *see also Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007) ("[A] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss.").

[30] "[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Zohar III, Corp.*, 639 B.R. 73, 90

First, the court must "take note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[31]

The movant bears the burden of showing that the dismissal is appropriate under Rule 12(b)(6).[32]

## DISCUSSION

**Count I**

Count I of the Complaint is predicated upon the proposition that Spirit's recovery from the Letter of Credit should be limited to the capped amount that would be allowable under 11 U.S.C. § 502(b)(6). Specifically, Plaintiff seeks a declaration that:

> (a) any draw request by Landlord in excess of the unpaid post-petition, pre-rejection rent plus the 502(b)(6) Cap violates the Bankruptcy Code; (b) any draw request by Landlord in excess of the unpaid post-petition, prerejection rent plus the 502(b)(6) Cap will constitute a breach of the Landlord's representation in any draw request; and (c) Landlord is prohibited from drawing any amount against the Letter of Credit in excess of the unpaid post-petition, pre-rejection rent plus the 502(b)(6) Cap.[33]

As noted above, the Court did not enter a temporary restraining order early in this litigation to prohibit the Landlord from drawing on the Letter of Credit. Accordingly, the remaining issues are (i) whether the draw request violated the Bankruptcy Code by exceeding the amount allowed under section 502(b)(6) and (ii) whether it constituted a breach of the Landlord's representation in the Letter of Credit. When making a draw request, the Letter of Credit requires Landlord to represent that "it has the right to draw under [the Letter of Credit] in the amount of the attached draft because the tenant has defaulted under [its] obligations under the lease."[34]

---

(Bankr. D. Del.), aff'd, 620 F. Supp. 3d 147 (D. Del. 2022), appeal dismissed sub nom. In re Zohar III, Corp. (3d Cir. Nov. 10, 2022) (quoting In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001)).

[31] Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (quoting Santiago, 629 F.3d at 121, 130).

[32] Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.), 496 F. Supp. 2d 404, 408 (D. Del. 2007).

[33] Adv. D.I. 11 ¶ 34.

[34] Id. ¶ 30.

6

Plaintiff's position is that the Landlord did not have the right to draw on the Letter of Credit in the full amount because that amount exceeds the section 502(b)(6) cap. If the draw request did not violate section 502(b)(6) – or more to the point, if section 502(b)(6) does not limit the Landlord's recovery – then the Landlord will not have breached its representation in the Letter of Credit. Because these two issues are answered by the same inquiry, they will be addressed together.

The Court turns first to a brief discussion of the legal framework and function of letters of credit in modern commerce. The letter of credit is an ancient device that has endured for centuries because of its "inherent reliability, convenience, economy and flexibility."[35] Over time, letter of credit usage has evolved, and today there are two primary categories of letters of credit: standby and commercial.[36] Commercial letters of credit are used as a simple payment mechanism often in sales of goods, while standby letters of credit are used to guarantee the performance of an obligation.[37] Standby letters of credit are considered the gold standard for payment assurance in commercial transactions and function as the virtual equivalent of cash.[38] Draw requests under a letter of credit are honored by an issuing bank without reference to the underlying transaction that the letter of credit supports, because the contracts are deemed to be independent of each other. This concept is known as the "independence principle." As explained further below, this independence promotes certainty and is intended to facilitate prompt recoveries to beneficiaries of a letter of credit.

---

[35] *Voest-Alpine International Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 682 (2d Cir. 1983).
[36] *See* John F. Dolan, 1 THE LAW OF LETTERS OF CREDIT: COMMERCIAL AND STANDBY CREDITS § 1.01 (4th ed. 2007).
[37] *See id.*
[38] *See id.* § 2.01.

Letters of credit involve three separate contracts.[39] The first is the contract between a debtor and creditor: as part of that contractual relationship, the creditor seeks a backstop to the debtor's performance under the contract. The second contract is between the debtor and the issuer of the letter of credit (typically a financial institution). This contract focuses on the debtor's obligation to reimburse the issuer if the issuer remits payment to the beneficiary of the letter of credit. This contract typically requires the posting of collateral by the debtor to secure its obligation to the issuer of the letter of credit. Finally, the third contract is between the issuer and the creditor, known as the beneficiary, and it provides that a specified sum will be paid to the beneficiary when conforming documents are presented to the issuer.[40]

"The relationship between each pair of parties involved in a letter of credit transaction is entirely independent, although each relationship is necessary to support a letter of credit, somewhat like the three legs of a tripod."[41] This structure, grounded in the independence principle, "seeks to preserve the viability of letters of credit, whose purpose is to allow the beneficiary to draw on the money before obtaining a judgment."[42]

It is "well-established that a letter of credit and the proceeds therefrom are not property of the debtor's estate."[43] When an issuer honors a proper draft under a letter of credit, it does so from its own assets, not from the assets of the applicant.[44] "As a result, the bankruptcy trustee is not entitled to enjoin a post-petition payment of funds under a letter of credit from the issuer to

---

[39] *OHC Liquidation Trust v. Discover Re (In re Oakwood Homes Corp.)*, 342 B.R. 59, 67 (Bankr. D. Del. 2006).
[40] Dolan, *supra* note 43, § 6.01.
[41] *Oakwood Homes*, 342 B.R. at 67 (quoting *P.A. Bergner & Co. v. Bank One, N.A. (In re P.A. Bergner & Co.)*, 140 F.3d 1111, 1114 (7th Cir. 1998)).
[42] *Oakwood Homes*, 342 B.R. at 67 (quoting *Int'l Fin. Corp. v. Kaiser Group Int'l Inc. (In re Kaiser Group Int'l Inc.)*, 399 F.3d 558, 566 (3d Cir. 2005)).
[43] *Oakwood Homes*, 342 B.R. at 67 (internal quotations omitted).
[44] *In re S-Tran Holdings, Inc.*, 414 B.R. 28, 34 (Bankr. D. Del. 2009).

the beneficiary, because such a payment is not a transfer of debtor's property."[45] This again reinforces the independence principle where, "ordinarily, the rule is 'pay first, litigate later.'"[46] And indeed, in this case the Court refused in the first instance the Plaintiff's request to enjoin Spirit's draw upon the Letter of Credit.

Although letter of credit proceeds are not property of the estate, "collateral pledged as a security interest for the letter of credit is property of the estate."[47] This nuance has created some confusion surrounding the operation of letters of credit in bankruptcy. To determine if funds are property of the estate, the starting point is to establish whether "the claim centers around the collateral pledged to the bank [or] the distribution of the proceeds themselves."[48]

The dispute before the Court relates to letter of credit proceeds, and whether the statutory cap in section 502(b)(6) of the Bankruptcy Code applies to those funds. Section 502(b)(6) caps a landlord's claim for damages resulting from the termination of a real property lease.[49] Under this section, a "landlord-creditor is entitled to rent reserved from the greater of (1) one lease year or (2) fifteen percent, not to exceed three years, of the remaining lease term."[50] Section 502(b)(6) is intended to limit landlords' recoveries for damages arising from rejection of commercial leases that might otherwise swamp a debtor's estate.[51]

---

[45] *S-Tran Holdings*, 414 B.R. at 34 (quoting *Kellogg v. Blue Quail Energy, Inc. (Matter of Compton Corp.)*, 831 F.2d 586, 589 (5th Cir. 1987)).
[46] *Sabratek Corp. v. LaSalle Bank, N.A. (In re Sabratek Corp.)*, 257 B.R. 732, 738 (Bankr. D. Del. 2000) (quoting *Eakin v. Continental Illinois National Bank & Trust Co.*, 875 F.2d 114, 116 (7th Cir. 1989)).
[47] *S-Tran Holdings*, 414 B.R. at 32 (citing *Int'l Fin. Corp. v. Kaiser Group Int'l Inc. (In re Kaiser Group Int'l Inc.)*, 399 F.3d 558, 566 (3d Cir. 2005)).
[48] *Oakwood Homes*, 342 B.R. at 67 (emphasis omitted).
[49] 11 U.S.C. § 502(b)(6).
[50] *Solow v. PPI Enters. (U.S.) (In re PPI Enters. (U.S.))*, 324 F.3d 197, 207 (3d Cir. 2003).
[51] *See* H.R.Rep. No. 95–595, at 353 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6309 ("[The cap] limits the damages allowable to a landlord of the debtor.... It is designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate.").

It is the Plaintiff's position that the Letter of Credit proceeds exceed what the Landlord would receive as an allowed claim under the 502(b)(6) calculation. The Landlord responds that since the Letter of Credit proceeds are not property of the estate, section 502(b)(6) does not apply to limit its recovery in any regard.

Plaintiff relies heavily on the Third Circuit's decision in *In re PPI Enters. (U.S.), Inc.* and argues that it requires this Court to find that Spirit's draw request violated section 502(b)(6).[52] In *PPI*, a landlord leased office space to the debtor for use as its corporate headquarters.[53] The lease ran for ten years and required annual payments of $620,000 for the first five years and $650,000 thereafter.[54] A standby letter of credit was issued to the landlord on behalf of the debtor in the amount of $650,000.[55] Years prior to commencing its bankruptcy case, the debtor abandoned the leased space and ceased making rent payments to the landlord.[56] The debtor failed to cure the default following proper notice, and the landlord subsequently drew down the full letter of credit and applied it to rent payments until the letter of credit was exhausted.[57] Shortly after exhausting the letter of credit, the landlord sued the debtor in district court.[58] On the eve of the damages trial, the debtor filed for relief under chapter 11.[59] In the chapter 11 proceeding, the landlord filed a proof of claim stating that its damages totaled $4,757,824.94.[60] The bankruptcy court first determined that the landlord's claim was subject to the 502(b)(6) cap.[61] Then, the court ruled that the letter of credit should be treated as a security deposit for purposes of the 502(b)(6)

---

[52] *PPI*, 324 F.3d 197.
[53] *Id.* at 200.
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.* at 200-01.
[58] *Id.* at 201.
[59] *Id.*
[60] *Id.*
[61] *In re PPI Enters. (U.S.)*, 228 B.R. 339, 348 (Bankr. D. Del. 1998).

calculation.[62] As a result, the allowed portion of the landlord's claim was reduced based on the letter of credit proceeds that had been received pre-petition.[63]

The Third Circuit affirmed this decision, concluding that the allowed portion of the claim should be reduced based on the amount previously drawn down under the letter of credit because allowing otherwise would result in an end run around the 502(b)(6) cap.[64] The court in *PPI* accounted for the letter of credit proceeds in determining the remaining amount of the landlord's allowed claim in a manner identical to how a standard security deposit would operate in bankruptcy.[65] To do so, the court focused on language in the parties' lease, which allowed it to conclude that "the parties intended the letter of credit to serve as a security deposit."[66]

As in *PPI*, the record here reveals that the Letter of Credit was provided by Tupperware as security for its performance under the Lease. The Lease expressly states that the Letter of Credit was "deposit[ed] with Landlord as security for the full and faithful performance by Tenant of all its obligations under this Lease[.]"[67] Under *PPI*, therefore, a claim filed by the Landlord in this case would be subject to the limitations of section 502(b)(6).

---

[62] *Id.* at 350.

[63] *Id.*

[64] *PPI*, 324 F.3d at 209.

[65] In *Oldden v. Tonto Realty Corp.*, the Second Circuit first considered whether a landlord is required to deduct the amount it held in a security deposit from its allowed claim. *Oldden*, 143 F.2d at 918. The court answered this question in the affirmative, explaining that the bankruptcy estate should not be liable for an amount in excess of the capped amount, so any amounts the landlord already received from a security deposit should be subtracted from its remaining allowed claim. *Id.* at 921. In *Oldden*, the security deposit held by the landlord was less than its allowed claim, but the court noted in dicta that the result should be the same in the unusual situation where the deposit exceeded the allowed claim – i.e., the court would have required the landlord to return the security deposit to the extent it exceeded the statutory limit. *Id.* Although *Oldden* was decided under a predecessor of the current section 502(b)(6), the legislative history accompanying the Bankruptcy Reform Act of 1978 expressly provides that the new statute "will not overrule *Oldden*, or the proposition for which it has been read to stand[.]" S. Rep. No. 95-989, at 63 (1978). Accordingly, a landlord's "security deposit will be applied in satisfaction of the claim that is allowed under [section 502]." *Id.* at 64.

[66] *PPI*, 324 F.3d at 210. The rider attached the parties' lease stated "the letter of credit was 'in lieu' of [the debtor's] cash security obligation in the leasehold agreement. The rider also provided that [the debtor] would be liable to [landlord] for replenishment of the security if he was forced to draw upon the letter of credit." *Id.*

[67] Adv D.I. 11.

11

However, the present case differs from *PPI* in one significant respect– here, the Landlord never filed a claim. Having not filed a claim, Landlord contends that this Court should follow the reasoning advanced in *In re Stonebridge Technologies*, a Fifth Circuit case where a landlord similarly did not file a claim in the bankruptcy case.[68]

In *Stonebridge*, a tenant was required to provide its landlord with a security deposit consisting of approximately $100,000 in cash and $1.4 million in the form of a letter of credit.[69] The tenant simultaneously executed a note payable to the issuing bank, secured by a $1,250,000 certificate of deposit, that could be used as reimbursement if the letter of credit was drawn upon by the landlord.[70] After the tenant filed a voluntary petition under chapter 11, the landlord submitted a draw request for the full amount of the letter of credit, which was honored by the issuing bank.[71] As noted, the landlord did not file a claim in the bankruptcy case for its lease rejection damages.[72] After honoring the draw request, the issuing bank sought relief from the automatic stay to liquidate the certificate of deposit that it held as reimbursement for the landlord's draw on the letter of credit.[73] The liquidating trustee reached a compromise with the bank, after which the trustee filed an adversary proceeding against the landlord alleging that the landlord breached the lease and made negligent misrepresentations to the bank by impermissibly drawing on the letter of credit and retaining monies in excess of the section 502(b)(6) cap.[74]

The Fifth Circuit started its analysis by noting "§ 502(b) applies only to claims against the bankruptcy estate."[75] The court reasoned that applying § 502(b)(6) to letter of credit proceeds

---

[68] *In re Stonebridge Techs., Inc.*, 430 F.3d 260 (5th Cir. 2005).
[69] *Id.* at 264.
[70] *Id.*
[71] *Id.*
[72] *Id.*
[73] *Id.* at 264-65.
[74] *Id.* at 265.
[75] *Id.* at 269.

in the absence of a claim would convert the section "into a self-effectuating avoiding power[.]"[76] Unlike 11 U.S.C. § 547(b), where the Code expressly creates an avoiding power, § 502(b)(6) "allows only one thing—disallowance of the filed claim to the extent that it exceeds the statutory cap."[77] Accordingly, the Fifth Circuit held that the landlord was entitled to retain the full proceeds obtained under the letter of credit.[78]

Like *Stonebridge*, the Landlord here has not itself filed a claim for its lease rejection damages in the bankruptcy case. However, Plaintiff has filed a claim ostensibly on the Landlord's behalf. Pursuant to section 501(b) of the Bankruptcy Code, "[i]f a creditor does not timely file a proof of such creditor's claim, an entity that is liable to such creditor with the debtor, or that has secured such creditor, may file a proof of such claim."[79]

Plaintiff claims that Uniform Commercial Code Section 5-117 and principles of subrogation law establish that it is a co-debtor with Tupperware, which permits it to file a claim on Spirit's behalf pursuant to section 501(b). Specifically, Plaintiff contends that, based upon its assumption of the reimbursement obligation to Wells Fargo, it can subrogate to Wells Fargo's rights and that as a matter of subrogation law, it is a secondary obligor under the Lease, giving it the right to file the proof of claim under section 501(b).

Landlord contends that Party Products is not a co-debtor of Tupperware and that principles of subrogation do not support the conclusion that Party Products is liable with Tupperware for Landlord's claim against the Debtor. According to Spirit, Party Products' reliance on U.C.C. Section 5-117 is misplaced because it provides only that an *applicant* who

---

[76] *Id.* at 270.
[77] *Id.* (quoting Laura B. Bartell, *The Lease Cap and Letters of Credit: A Reply to Professor Dolan*, 120 BANKING L.J. 828, 835 (2003)).
[78] *Id.* at 271.
[79] 11 U.S.C. § 501(b).

reimburses an issuer can subrogate to the rights of the issuer. Here, Party Products is a third-party who assumed the applicant's obligation to the issuer, not the applicant itself. Even if Party Products was the applicant, Spirit claims this would only allow Party Products to subrogate to Wells Fargo's rights, not Spirit's rights.

Under Uniform Commercial Code Section 5-117, "[a]n issuer that honors a beneficiary's presentation is subrogated to the rights of . . . the applicant to the same extent as if the issuer were the secondary obligor of the underlying obligation owed to the applicant."[80] And, an "applicant that reimburses an issuer is subrogated to the rights of the issuer against any beneficiary . . . ."[81] Under the Asset Purchase Agreement, Plaintiff assumed certain liabilities, including the obligation to reimburse Wells Fargo in the event the Letter of Credit was drawn upon by Spirit.

Plaintiff has alleged that it has filed its own "claim against the Debtor as subrogee" and also filed a proof of claim "on behalf of [the] Landlord[.]"[82] For purposes of the pleading requirements of Rule 12, Plaintiff has adequately alleged that it had the right to file a claim on behalf of the Landlord pursuant to Bankruptcy Code § 501(b). Accordingly, the Landlord's Motion to Dismiss will be denied as to Count I.

**Count II**

Plaintiff also seeks a declaration that the Lease's liquidated damages provision is an unenforceable penalty.[83] Landlord responds by arguing that this Court lacks subject matter jurisdiction, the Plaintiff lacks standing, and that Plaintiff fails to state a claim upon which relief can be granted. For the reasons explained below, the Court finds that it does indeed possess

---

[80] 6 Del C. § 5-117(a).
[81] *Id.* § 5-117(b).
[82] Adv. D.I. 11 ¶¶ 23-24.
[83] *Id.* ¶ 42.

14

subject matter jurisdiction over the state law contract claim. Further, Plaintiff has adequately pleaded at this stage a claim that the liquidated damages provision in the Lease is an unenforceable penalty. Finally, the Plaintiff has offered sufficient allegations that it has standing to survive the Landlord's Motion to Dismiss.

### 1. Subject Matter Jurisdiction

In its Complaint, Plaintiff alleges jurisdiction is proper pursuant to 28 U.S.C. § 1334(b) because the adversary proceeding either arises under, arises in, or relates to the main bankruptcy case.[84] In briefing, Plaintiff clarifies its position as to the state law claims, arguing that the Court has jurisdiction over the claims because they "relate to" the bankruptcy proceeding.[85] The Landlord contests this assertion, arguing that "related to" jurisdiction does not exist because any impact on the estate depends upon Party Products filing a separate claim.[86] Landlord argues categorically that there cannot be a *direct* impact on the estate when any impact is contingent on a subsequent action.[87] Landlord also suggests that the Plaintiff is required to satisfy the more stringent "close nexus" test set forth by the Third Circuit in *In re Resorts International, Inc.*[88]

In *Pacor, Inc. v. Higgins*, the Third Circuit explained that "[an] action is 'related to' a bankruptcy proceeding if the 'outcome of that [action] could conceivably have any effect on the estate being administered in bankruptcy.'"[89] "Related matters are generally causes of action under state law that are imported into the bankruptcy because of their impact on the size of the debtor's estate, and hence the distribution to the debtor's creditors."[90] For post-confirmation

---

[84] *Id.* ¶ 5.
[85] Adv. D.I. 22.
[86] Adv. D.I. 28.
[87] *Id.*
[88] *See In re Resorts Intern., Inc.*, 372 F.3d 154 (3d Cir. 2004).
[89] *In re Am. Home Mortg. Holding*, 477 B.R. 517, 528 (Bankr. D. Del. 2012) (quoting *Pacor, Inc. v. Higgins*, 473 F.2d 984, 994 (3d Cir. 1984).
[90] *In re Essar Steel Minnesota, LLC*, 47 F.4th 193, 197 (3d Cir. 2022).

15

matters, the Third Circuit has explained that the bankruptcy court's "related to" jurisdiction extends only to claims and proceedings that possess a "close nexus" to the bankruptcy plan or proceeding.[91] In *In re Seven Fields Development Corp.*, the Third Circuit further refined the contours of post-confirmation jurisdiction, stating that "the *Pacor* test applies in all disputes raised pre-confirmation and the 'close nexus' test applies in all disputes raised post-confirmation, regardless of when the conduct alleged in the complaint occurred."[92] Accordingly, the "close nexus" test only applies "if the plaintiff *files* its action after the confirmation date."[93]

Here, Plaintiff commenced this adversary proceeding on January 27, 2025, over three months prior to plan confirmation.[94] Therefore, the heightened close nexus standard is inapplicable, and Plaintiff need only satisfy the *Pacor* test.

As explained above, subject matter jurisdiction exists if a proceeding's outcome could conceivably affect administration of the estate. Here, resolution of the state-law claims would almost inevitably impact administration of the estate. The Court's determination of this issue will influence the amount of any claim filed by the Plaintiff against the estate (assuming at this stage that it has the right to file such a claim against the Debtors), thereby materially affecting the distributions to other creditors under the Debtors' plan. This effect is sufficiently conceivable for the Court to find that subject matter jurisdiction does exist.[95] Accordingly, the Court finds that "related to" jurisdiction exists pursuant to 28 U.S.C. § 1334, and that the state law claims will not be dismissed for lack of subject matter jurisdiction.

## 2. Standing

---

[91] *Resorts*, 372 F.3d 154.
[92] *In re Seven Fields Dev. Corp.*, 505 F.3d 237, 265 (3d Cir. 2007).
[93] *In re Am. Home Mortg. Holding*, 477 B.R. 517, 529–30 (Bankr. D. Del. 2012).
[94] Adv. D.I. 1; D.I. 701.
[95] *See In re Semcrude*, 428 B.R. 82, 96-100 (Bankr. D. Del. 2010).

16

In its Motion to Dismiss, Landlord argues that Plaintiff lacks standing to assert the state law contract claims because it is not a party to the contract nor is it an intended third-party beneficiary.[96] Plaintiff responds that it has adequately alleged standing to pursue the contract claims on either of two distinct theories: by way of subrogation, or because it acquired Tupperware's defenses and causes of actions via the Asset Purchase Agreement.[97]

Specifically, Plaintiff has alleged that, as the party that must reimburse the issuer of the Letter of Credit, it is subrogated to all of Tupperware's rights and defenses by operation of U.C.C. § 5-117. In that capacity, Plaintiff contends that it enjoys the same rights as Tupperware to challenge any provision of the Lease, including the liquidated damages clause. Likewise, the Asset Purchase Agreement delivered to Party Products all of Tupperware's defenses and claims against the Landlord.[98]

Landlord's argument that Party Products is not an intended third-party beneficiary under the Lease misses the point. The Plaintiff has stepped into Tupperware's shoes and has adequately alleged that it has standing to assert the claims and defenses in the Complaint.

## 3. Merits of the Unenforceable Penalty Claim

Finally, Spirit contends that the amount of the liquidated damages provision is not disproportionate to its anticipated damages because the parties were sophisticated commercial entities, understood the unique nature of the premises and acknowledged the difficulty Spirit would face in mitigating its damages by re-leasing the property. Plaintiff argues in response that the Lease's liquidated damages provision is an unenforceable penalty because it provides for

---

[96] Adv. D.I. 19.

[97] Adv. D.I. 22.

[98] *Id.* (quoting Asset Purchase Agreement § 1.1(i) ("Plaintiff acquired all rights against third parties relating to the Acquired Liabilities, including all causes of action, claims, defenses, rights of set off, rights of recovery and rights of recoupment")) (internal quotation marks omitted).

17

damages far in excess of the expected damages for breach and is arbitrary because it provides for millions in liquidated damages over the first five years of the Lease but not the final six years.

Case law teaches that the determination of whether a contract provision is an unenforceable penalty requires a factual inquiry into the intent and expectations of the parties entering into the contract.[99] For example, in applying Florida law (which governs this Lease), courts must determine whether the sum stipulated to in a liquidated damages provision is so disproportionate to any reasonably expected damages as to provide a windfall to the non-breaching party.[100] Similarly, a factual determination that actual damages would not have been readily ascertainable at the time of contracting necessarily cannot be made at this stage of the pleadings. Plaintiff has adequately alleged a claim for an unenforceable penalty to survive the Motion to Dismiss.

**Count III**

In the final count of the Complaint, Plaintiff seeks a finding that Landlord was unjustly enriched by the amount received in excess of the section 502(b)(6) cap.[101] Plaintiff states it would be inequitable for Landlord to retain these proceeds and that the Court should order that the amount above the 502(b)(6) cap be returned to Plaintiff.[102] Landlord states the claim should be dismissed because, among other reasons, "an express contract exists concerning the same subject matter."[103]

---

[99] See Rosenthal Collins Grp., LLC v. Moneytec, LLC, No. 08-60992-CIV, 2010 WL 556382, at *2 (S.D. Fla. Feb. 11, 2010) ("Whether a liquidated damages provision is reasonable must be determined under the particular facts and circumstances of a case").

[100] Lefemine v. Baron, 573 So. 2d 326, 328 (Fla. 1991).

[101] Adv. D.I. 11 ¶ 46.

[102] Id. ¶ 47.

[103] Adv. D.I. 28 (quoting Diamond "S" Dev. Corp. v. Mercantile Bank, 989 So. 2d 696, 697 (Fla. Dist. Ct. App. 2008)).

Resolution of the unjust enrichment claim depends on the Court's disposition on Count I and II. Because factual issues prevent a final determination of these Counts at this stage, Count III is similarly not ripe for disposition. Accordingly, the Landlord's Motion to Dismiss will be denied with respect to Count III.

## CONCLUSION

For the foregoing reasons, the Court will deny the Landlord's Motion to Dismiss with respect to Counts I, II, and III. An appropriate Order accompanies this Opinion.

Dated: April 1, 2026
Wilmington, Delaware

BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE

19